UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND SERIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 6262 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| BRUCE RAUNER et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Raymond Serio ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 alleging, among other things, a deprivation of his Eighth Amendment rights against Bruce Rauner ("Rauner"), Wexford Health Sources, Inc. ("Wexford"), the Illinois Department of Corrections ("IDOC"), Shanal Barnett ("Barnett," who was incorrectly sued as "Nurse Channel"), LaTanya Williams ("P.A. Williams"), Ann Davis ("Davis"), Tarry Williams ("Warden Williams"), Saleh Obaisi ("Obaisi"), Salvador Godinez ("Godinez"), Daphine Walker ("Walker"),[1] Fe Funtes ("Fuentes"), John Trost ("Trost"), Erica Easton ("Easton"), Garret Griffin ("Griffin"), Kim Butler ("Butler"), Andrew Tilden ("Tilden"), Riliwan Ojelade ("Ojelade"), and Guy Pierce ("Pierce") (collectively, "Defendants"). (R. 72, Am. Compl. ¶¶ 183-257.) Pursuant to Federal Rule of Civil Procedure 56, Wexford, Davis, Obaisi, Tilden, Trost, Fuentes, P.A. Williams, and Ojelade (collectively, the "Wexford Defendants") move for summary judgment. (R. 192, Mot. for Summ. J.) IDOC, Rauner, Godinez, Pierce, Butler, Warden Williams, Barnett, Griffin, and Easton (collectively, the "State Defendants") jointly filed a separate motion for summary judgment. (R. 202, Mot. for Summ. J.) For the reasons stated below, the Wexford Defendants'

---

[1] Walker has just recently filed an answer in this case, and she has not joined in the pending motions for summary judgment. (R. 246, Answer.)

motion for summary judgment is denied and the State Defendants' motion is granted in part and denied in part.

## RELEVANT FACTS

The following facts are undisputed unless otherwise stated. Plaintiff is an inmate that has been incarcerated at the following IDOC correctional centers: Stateville Correctional Center ("Stateville") in Crest Hill, Illinois, Mernard Correctional Center ("Menard") in Menard, Illinois, and Pontiac Correctional Center ("Pontiac") in Pontiac, Illinois. (R. 238, Pl.'s Resp. to State Facts ¶ 1.) Plaintiff was housed at Stateville from December 26, 2013, until October 15, 2014; at Menard from October 15, 2014, until December 30, 2015; and at Pontiac from December 30, 2015, until May 19, 2017. (*Id.* ¶¶ 14-16.)

IDOC is an agency of the state of Illinois that operates the state's prison system. (*Id.* ¶ 10.) Wexford is a private corporation that has a contract with IDOC to provide medical services at IDOC's correctional facilities. (R. 217, Pl.'s Resp. to Wexford Facts ¶ 5.) The parties dispute whether Wexford itself dictates medical treatment for inmates as opposed to the medical professionals that work for Wexford. (*Id.* ¶¶ 6-9.)

The individual Defendants had various roles related to IDOC's supervision and care of inmates. During the timeframe relevant to Plaintiff's claims, Davis, Obaisi, Fuentes, Trost, and Tilden were physicians who worked for Wexford and provided medical care to IDOC inmates. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 4-5.) During the pendency of this action, Obaisi passed away, and his estate was substituted as a party. (R. 137, Suggestion of Death at 1-2; R. 155, Order.) P.A. Williams and Ojelade were physician assistants that helped treat IDOC inmates. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 4-5, 28, 57, 71.) Rauner was the governor of the state of Illinois, and Godinez was the director of IDOC. (R. 238, Pl.'s Resp. to State Facts ¶¶ 5, 8.)

Warden Williams was the warden at Stateville,[2] Butler was the warden at Menard, and Easton and Griffin were correctional officers at Menard. (*Id.* ¶¶ 3-4, 6, 9.) Pierce was the warden at Pontiac, and Barnett was an IDOC medical technician. (*Id.* ¶¶ 2, 7.)

The parties dispute a number of facts related to Plaintiff's medical care while he was incarcerated. Specifically, the parties dispute whether Godinez was aware of Plaintiff's medical condition; Plaintiff claims that he encountered Godinez in person and made Godinez aware of his medical needs. (*Id.* ¶¶ 23-24.) The parties also dispute whether Plaintiff personally interacted with Butler, Warden Williams, Easton, Pierce, and Griffin in a way that made them personally aware of his medical needs. (*Id.* ¶¶ 25-31, 39, 44-47.) The parties further proffer competing accounts as to whether Plaintiff was required to obtain a new medical permit to transfer his medical accommodations when he was relocated to a new correctional facility. (*Id.* ¶ 38.) In addition, the parties dispute whether Plaintiff's medical condition was severe, or whether Plaintiff had "mild" arthritis. (*Id.* ¶¶ 50-53.)

On December 26, 2013, Plaintiff fell down the stairs while he was housed at Stateville, which caused pain in his left knee.[3] (R. 217, Pl.'s Resp. to Wexford Facts ¶ 11.) Defendants claim that Barnett brought Plaintiff a wheelchair and took him to the prison's health care unit, but Plaintiff offers a different account in which Barnett ordered Plaintiff to put weight on his leg before he was given a wheelchair, which further exacerbated his injury. (R. 238, Pl.'s Resp. to State Facts ¶¶ 54-55.) The parties also disagree about how much time it took after Plaintiff was placed into the wheelchair until he was given pain medication and was seen by a doctor. (*Id.*

---

[2] The parties, however, present conflicting accounts as to whether Warden Williams was in charge of Stateville's day-to-day operations while Plaintiff was housed there. (R. 249, State Resp. to Pl.'s Facts ¶ 11.)

[3] Before this happened, Plaintiff had prior injuries to his left knee and right shoulder. (R. 217, Pl.'s Resp. to Wexford Facts ¶ 12.)

¶ 57.) Defendants assert that 45 minutes had elapsed, and Plaintiff claims that two hours had gone by before he was finally given medication and taken to the infirmary. (R. 238, Pl.'s Resp. to State Facts ¶ 57; R. 217, Pl.'s Resp. to Wexford Facts ¶ 13.)

It is undisputed that when Plaintiff finally reached the infirmary, he was treated by Obaisi, although the parties present conflicting evidence as to the severity of Plaintiff's injuries and how much time elapsed before Plaintiff was given medication to ease his pain. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 13-15.) Obaisi performed an X-ray on Plaintiff's knee, but the parties dispute whether Obaisi ordered crutches for Plaintiff. (*Id.* ¶¶ 13, 16-17.) Plaintiff claims, and Defendants dispute, that Plaintiff did not receive his crutches and "hopped from the Health Care Unit to his cellhouse[.]" (R. 249, State Resp. to Pl.'s Facts ¶ 4.) The parties also dispute whether, when Plaintiff arrived at his cell house, he was required to climb more stairs and then required to walk up and down four flights of stairs on a daily basis, which caused him severe pain that almost resulted in Plaintiff losing consciousness. (*Id.* ¶¶ 5-6.)

On January 27, 2014, Plaintiff received a set of crutches 22 days after the day he returned from the infirmary. (*Id.* ¶ 7.) The parties dispute whether during this 22-day period Plaintiff struggled to move around the correctional facility and was mocked by prison guards. (*Id.* ¶ 8.) On January 31, 2014, Plaintiff met with Davis to discuss lingering pain in his left knee. (R. 217, Pl.'s Resp. to Wexford Facts ¶ 18.) The parties do not dispute that Davis ordered Plaintiff a knee brace and a low bunk permit, but dispute whether Davis ordered Plaintiff a low gallery permit.[4] (*Id.* ¶¶ 18-19.) They also dispute whether Wexford is responsible for issuance of a low gallery permit. (*Id.* ¶ 20.)

---

[4] A "low gallery" permit allows prisoners to "be celled on a ground floor as to minimize the amount of stairs [the prisoner] would have to climb on a daily basis." *Gaddis v. Walker*, No. 08-1067, 2010 WL 1416847, at *3 (C.D. Ill. Mar. 31, 2010).

On March 9, 2014, Plaintiff complained of shoulder pain allegedly stemming from his fall that occurred in December 2013. (*Id.* ¶ 21.) To help with the pain, Davis prescribed Plaintiff an analgesic balm, and Davis also ordered X-rays of Plaintiff's shoulder. (*Id.* ¶¶ 22.) The parties dispute whether the X-rays showed that Plaintiff was not suffering from damage to soft tissue or joints in his shoulder and knee. (*Id.* ¶ 23.)

On March 27, 2014—91 days after the December 2013 fall—Plaintiff received a low gallery permit at Stateville. (R. 236, Wexford's Resp. to Pl's Facts ¶ 7.) On April 30, 2014, Plaintiff met with Obaisi and complained that the medications prescribed to Plaintiff were not helping with his pain. (R. 217, Pl.'s Resp. to Wexford Facts ¶ 24.) In response, Obaisi gave Plaintiff cortisone shots in his shoulder to reduce Plaintiff's pain. (*Id.* ¶ 25.)

On October 15, 2014, Plaintiff was transferred to Menard, (*id.* ¶ 27), and the parties dispute whether Plaintiff received adequate medical care at Menard. Plaintiff claims that he did not receive proper medical treatment from Fuentes, P.A. Williams, and Trost, and that his medical permits and crutch were not transferred from Stateville to Menard. (*Id.* ¶¶ 28-31; R. 249, State Resp. to Pl.'s Facts ¶¶ 12-14.) At Menard, Plaintiff was evaluated first by Fuentes. (R. 217, Pl.'s Resp. to Wexford Facts ¶ 30.) Plaintiff claims, and Defendants dispute, that Fuentes denied him any possibility of obtaining crutches. (R. 236, Wexford's Resp. to Pl's Facts ¶ 11.) The parties dispute whether Plaintiff's inability to have his crutch transferred caused him to become "seriously withdrawn and depressed" and whether his mental health deteriorated to "depression, feelings of hopelessness," and led to "mania and panic attacks." (R. 249, State Resp. to Pl.'s Facts ¶¶ 14-15.)

Plaintiff was then referred to Trost, who Plaintiff claims obstructed his ability to obtain crutches. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 31, 33.) Trost ordered X-rays of Plaintiff, but

Plaintiff again presents evidence showing that the X-rays could not properly diagnose soft tissue or joint damage. (*Id.* ¶ 32.)

On October 24, 2014, Plaintiff again fell down the stairs, this time at Menard, and "passed out" from the resulting pain; the parties, however, dispute how quickly he was seen by medical professionals. (*Id.* ¶¶ 34-35; R. 236, Wexford's Resp. to Pl's Facts ¶ 15.) Following this fall, Trost admitted Plaintiff into the infirmary and ordered X-rays. (R. 217, Pl.'s Resp. to Wexford Facts ¶ 36.) Plaintiff then met with Trost again on February 24, 2015, and Plaintiff complained of knee and shoulder pain. (*Id.* ¶¶ 37-38.) As a result, Trost increased the dosage of Plaintiff's pain medication but did not prescribe Plaintiff a narcotic pain medication. (*Id.* ¶¶ 38-39.) At Menard, Plaintiff claims that he repeatedly complained to Fuentes about excruciating pain, but that Fuentes took no action to help Plaintiff relieve his pain or schedule a magnetic resonance imaging ("MRI") exam to ascertain the cause of such pain. (*Id.* ¶¶ 16-18.) The parties present evidence that diverges as to whether Plaintiff was a good candidate for narcotic pain medication. (*Id.* ¶ 39.)

On May 22, 2015, Plaintiff had a follow-up appointment with Trost where Plaintiff requested an MRI exam on his knee. (*Id.* ¶ 40.) Though Plaintiff requested an MRI exam, it is undisputed that Plaintiff has no medical training or experience. (*Id.* ¶ 41.) Defendants present evidence showing that Trost did not exhaust the treatment options that are necessary before performing an MRI exam, and Plaintiff comes forward with evidence showing that Trost and Wexford denied the MRI exam for other arbitrary reasons and reasons related to the cost of an MRI exam. (*Id.* ¶¶ 42-47.) The parties dispute the extent of Plaintiff's pain and whether Trost took appropriate measures to manage Plaintiff's pain. (*Id.* ¶¶ 48-55.) Plaintiff presents evidence showing that, because he was confined to his cell at Menard due to his injuries, his mental health

deteriorated to the point where he was hallucinating, depressed, and suffering anxiety attacks. (R. 236, Wexford's Resp. to Pl's Facts ¶ 31.)

On December 30, 2015, Plaintiff was transferred from Menard to Pontiac. (R. 238, Pl.'s Resp. to State Facts ¶ 16.) The parties again dispute whether Plaintiff received proper medical treatment at Pontiac. (R. 249, State Resp. to Pl.'s Facts ¶¶ 21-25.) Plaintiff presents evidence showing that he was refused his medication when he arrived at Pontiac, and that Tilden and Ojelade required him to "hobble, or stumble," to his doctor appointments even though he was "in extreme and continuing pain." (R. 217, Pl.'s Resp. to Wexford Facts ¶ 57; R. 236, Wexford's Resp. to Pl's Facts ¶¶ 32-33.) Plaintiff presents evidence showing that on January 21, 2016, Plaintiff was seen by Tilden, at which time Tilden examined Plaintiff and obtained Plaintiff's medical history. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 58-59.) The parties present conflicting evidence as to whether Plaintiff experienced pain and whether Plaintiff had a full range of motion in his right shoulder and left knee. (*Id.* ¶¶ 60-61.) Tilden ordered X-rays of Plaintiff's right shoulder and left knee, and the X-rays indicated that Plaintiff's right-shoulder and left knee "were normal." (*Id.* ¶¶ 63-64.) The parties dispute whether Plaintiff had symptoms that would require him to undergo an MRI exam to properly diagnose his condition. (*Id.* ¶¶ 65-67.) The parties also present irreconcilable evidence regarding the adequacy of Tilden's medical care. (R. 236, Wexford's Resp. to Pl's Facts ¶¶ 36-39.)

On June 5, 2016, Plaintiff complained to Tilden of lingering pain, so Tilden prescribed Plaintiff a stronger pain medication that helped control Plaintiff's pain. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 68-72.) The parties dispute whether Tilden could have eased Plaintiff's pain by prescribing a walking aid, and whether Plaintiff exhibited severe pain that would have required more than what Tilden prescribed. (*Id.* ¶¶ 73-76.)

Plaintiff has never spoken with, sent correspondence to, or personally seen Rauner. (R. 238, Pl.'s Resp. to State Facts ¶¶ 18-20.) Rauner has never personally denied medical care to Plaintiff. (*Id.* ¶ 21.) Plaintiff, however, asserts that Rauner is "personally responsible for his medical treatment because . . . Rauner is in charge of the contract with Wexford." (*Id.* ¶ 22.)

## PROCEDURAL HISTORY

Plaintiff filed his original complaint, *pro se*, on June 9, 2015, in the U.S. District Court for the Central District of Illinois. (R. 1, Compl.) His case was then transferred to this District shortly thereafter, on July 16, 2015. (R. 8, Order.) Plaintiff was then appointed counsel, (R. 15, Order), and amended his complaint twice, with the second amended complaint being the operative complaint.[5] (R. 37, Am. Compl.; R. 72, Second Am. Compl.; R. 210, Mot.; R. 214, Order.)

Plaintiff brings nine counts against Defendants. (R. 72, Second Am. Compl. ¶¶ 183-257.) In Counts I, II, III, VII, and IX, Plaintiff alleges that Walker, Barnett, P.A. Williams, Davis, Obaisi, Trost, Fuentes, Easton, Griffin, Tilden, and Ojelade deprived him of his constitutional rights under the Eighth Amendment by deliberately delaying medical care and exercising deliberate indifference to Plaintiff's serious medical needs. (R. 72, Second Am. Compl. ¶¶ 183-204, 238-43, 252-57.) In Count IV, Plaintiff brings a claim pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), alleging that Wexford, Rauner, Godinez, Warden Williams, Butler, and Pierce maintained policies and procedures that repeatedly resulted in the denial of adequate medical care to Plaintiff and other inmates thereby causing deprivations of their Eighth Amendment rights to be free from cruel and unusual

---

[5] Plaintiff moved to correct the name of one of the Defendants, and the Court granted Plaintiff's motion. (R. 214, Order.) Besides the corrected name, the allegations in the second amended complaint are the operative allegations in this case. (*See id.*; R. 210, Mot. for Leave to Amend at 4.)

punishment. (*Id.* ¶¶ 205-22.) In Counts V and VI, respectively, Plaintiff alleges that IDOC violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1211-34, and Rehabilitation Act, 29 U.S.C. § 794, by denying him reasonable accommodations for his physical impairments and by maintaining policies and practices that exacerbated his poor physical condition (*Id.* ¶¶ 223-37.) Finally, in Count VIII, Plaintiff brings state-law claims for intentional infliction of emotional distress ("IIED") against Barnett, Obaisi, Fuentes, Trost, Easton, Griffin, Tilden, and Ojelade. (*Id.* ¶¶ 244-51.)

On June 26, 2018, Butler and Barnett moved to dismiss the claims against them. (R. 161, Mot. at 1-2, 12.) On September 17, 2018, the Court dismissed the claim against Butler in her official capacity but denied the motion to dismiss in all other respects. (R. 174, Order at 14.)

On December 14, 2018, the Wexford Defendants moved for summary judgment. (R 192, Mot. for Summ. J.) They argue that Plaintiff's Section 1983 claims fail because "Plaintiff cannot show that any medical provider was deliberately indifferent to his serious medical needs." (R. 194, Mem. at 4.) They also argue that Plaintiff has not presented any evidence of a policy or practice that led to a deprivation of Plaintiff's constitutional rights; therefore, according to the Wexford Defendants, Plaintiff's *Monell* claim cannot survive summary judgment. (*Id.* at 12-13.) Finally, the Wexford Defendants argue that Plaintiff's IIED claim fails as a matter of law because Plaintiff presents no evidence supporting any element of his IIED claim. (*Id.* at 13-15.) In response to the Wexford Defendants, Plaintiff maintains that there are issues of material fact precluding summary judgment on his Section 1983, *Monell*, and IIED claims. (R. 216, Resp. at 2-15.)

On December 27, 2018, the State Defendants moved for summary judgment. (R. 202, Mot. for Summ. J. at 1-2.) First, the State Defendants argue that Plaintiff is a class member in a

class action seeking equitable relief filed in this District on October 7, 2011, *Lippert, et al. v. Godinez et al.*, case number 10-cv-4603. (R. 204, Mem. at 4-5.) More specifically, they argue that prevailing case law bars Plaintiff from bringing his claims for injunctive and equitable relief because he is a class member in *Lippert*. (*Id.*) The State Defendants also maintain that the claims against Rauner, Godinez, Pierce, Butler, and Warden Williams fail because they had no personal involvement in the alleged conduct that forms the basis of Plaintiff's claims. (*Id.* at 5-7.) The State Defendants also argue that the claims against Rauner in his official capacity are barred by the Eleventh Amendment of the U.S. Constitution. (*Id.* at 7-9.)

With respect to Warden Williams, Barnett, Easton, and Griffin, the State Defendants contend that the claims for injunctive relief against them in their official capacities are moot because Plaintiff no longer resides at the correctional facility where those defendants are employed. (*Id.* at 9-10.) The State Defendants also argue that Plaintiff "cannot establish [that] Defendants denied him any medical care," and therefore Plaintiff has no claim for deprivation of his Eighth Amendment rights based on any of the individual State Defendants' alleged deliberate indifference to his serious medical needs. (*Id.* at 10-12.)

As for the IIED claims against the State Defendants, the State Defendants argue that those claims fail because the conduct at issue in this case was not sufficiently "extreme and outrageous" to give rise to an IIED claim. (*Id.* at 12-13.) Finally, they argue that Plaintiff's ADA and Rehabilitation Act claims fail because Plaintiff is not a "qualified individual" with a disability who is protected from discrimination under the ADA or Rehabilitation Act. (*Id.* at 14-15.)

In response, Plaintiff argues that *Lippert* does not bar his claims because there are several IDOC defendants who are not named defendants in *Lippert*. (R. 237, Resp. at 3-5.) Plaintiff also

argues that Defendants waived this argument by not raising it as an affirmative defense, and that Plaintiff's injunctive relief is different from the relief sought in *Lippert*; therefore, *Lippert* does not bar his claims. (*Id.* at 3-5.) Plaintiff contends that summary judgment is improper as to Warden Williams, Butler, Pierce, and Godinez because there are issues of fact as to whether they "knew of or participated in systemic violations of denial of medical care at Stateville, Menard, and Pontiac[.]" (*Id.* at 5-9.)

Plaintiff maintains that material issues of fact preclude summary judgment on his IIED claims against the State Defendants, because there is a factual dispute over whether their conduct was so extreme and outrageous to rise to the level of IIED. (*Id.* at 9-12.) Finally, Plaintiff argues that his ADA and Rehabilitation Act claims survive summary judgment because he has presented evidence that he is a "qualified individual" who is protected by those statutes. (*Id.* at 13-15.) Both motions for summary judgment are now fully briefed. (R. 235, Wexford Reply; R. 248, State Reply.)

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). In deciding whether a dispute exists, the Court must "consider all of the evidence in the record in the light most favorable to the non-moving party[] and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his or her] favor." *Id.* (citation and internal quotation marks omitted). "Inferences supported only by speculation or conjecture will not suffice," and neither "will the mere scintilla of evidence." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). In addition, not all factual disputes will preclude the entry of summary judgment but only disputes of material fact—"irrelevant or unnecessary factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation and internal quotation mark omitted). "[T]he substantive law will identify which facts are material." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (citation omitted). In deciding a summary judgment motion, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson*, 477 U.S. at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697,

704-05 (7th Cir. 2011). Instead, the Court's function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Anderson*, 477 U.S. at 249). With these principles in mind, the Court first addresses the Wexford Defendants' motion for summary judgment and then turns to the State Defendants' motion for summary judgment.

## ANALYSIS

### I. The Wexford Defendants' Motion for Summary Judgment

#### A. Section 1983 Claims against Davis, Obaisi, Tilden, P.A. Williams, Trost, Fuentes, and Ojelade

Plaintiff's Section 1983 claims against Davis, Obiasi, Tilden, P.A. Williams, Trost, Fuentes, and Ojealde are based on their alleged indifference to Plaintiff's serious medical needs. (R. 72, Second Am. Compl. ¶¶ 192-204, 238-43, 245-57.) Section 1983 creates liability against any person who "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation and internal citation omitted); *see also Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015) (explaining that when prison officials are deliberately indifferent to a convicted prisoner's serious medical needs, they violate that prisoner's Eighth Amendment rights). Such indifference must be deliberate or reckless in the criminal sense, "[n]egligence, gross negligence, or even 'recklessness' as that term is used in tort cases is not enough." *Id.* at 785 (quotation omitted).

The Wexford Defendants argue that there is not enough evidence for the deliberate indifference claims against Davis, Obiasi, Tilden, P.A. Williams, Trost, Fuentes, and Ojelade to

survive summary judgment. (R. 194, Mem. at 4-12.) "To prevail on a deliberate-indifference claim, the plaintiff must prove that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quotation omitted). The standard for indifference, therefore, is a subjective one: "The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Zaya*, 836 F.3d at 804. "Whether a prison official was subjectively aware of a risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quotation omitted). "The subjective element requires more than negligence[,] and it approaches intentional wrongdoing." *Burton*, 805 F.3d at 784 (quotation omitted).

The Court finds that there are too many factual disputes to resolve the Section 1983 claims against the individual Wexford Defendants. For the first element, whether Plaintiff suffered from an "objectively serious medical need," Plaintiff must come forward with evidence showing that his condition was "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (quotation omitted). The Wexford Defendants do not argue that Plaintiff fails to present sufficient evidence on this issue. (R. 194, Mem. at 4-12.) Additionally, the Court finds that Plaintiff has presented enough evidence to survive summary judgment, as he has come forward with evidence showing he had a serious medical condition for which he did not receive adequate treatment, (*see, e.g.*, R. 238, Pl.'s Resp. to State Facts ¶¶ 50-53). *See Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011) ("[A] broad range of medical

conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit.").

Turning to the second element of a deliberate indifference claim—whether the Wexford Defendants were "deliberately" or "subjectively" indifferent to a serious medical need, *Whiting*, 839 F.3d at 662—this element may be inferred when "the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King v. Kramer*, 680 F.3d 1013, 1018-19 (7th Cir. 2012) (quotation omitted). The Court must remain "sensitive to the line between malpractice," which is not actionable as a deprivation of Eighth Amendment rights, and "treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment." *Id.*

There are several disputed issues of fact as to whether Davis, Obiasi, Tilden, P.A. Williams, Trost, Fuentes, and Ojealde harbored a subjective state of mind that was indifferent to Plaintiff's medical needs. Plaintiff presents evidence showing that each of the individual Wexford Defendants were aware that Plaintiff was in severe pain caused by his medical condition, and that they declined to take minimal efforts to address Plaintiff's pain. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 13-76.) While this evidence is largely Plaintiff's own sworn testimony, the Court cannot, on summary judgment, weigh the credibility of this evidence against the evidence that Defendants present. *See Omnicare, Inc.*, 629 F.3d at 704-05. Summary judgment, therefore, is denied on the Section 1983 claims against Davis, Obiasi, Tilden, P.A. Williams, Trost, Fuentes, and Ojealde. *See Rivera v. Gupta*, 836 F.3d 839, 840-43 (7th Cir. 2016) (reversing grant of summary judgment for defendant where there was evidence that the

defendant refused to examine the plaintiff or provide any medical treatment for his pain and numbness); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (explaining that "a prison official's decision to ignore a request for medical assistance," "a prison official['s] persist[ence] in a course of treatment known to be ineffective," and "an inexplicable delay in treatment" are all situations that might establish a defendant's subjective indifference to a prisoner's serious medical need), *as amended* (Aug. 25, 2016); *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 989-90 (N.D. Ill. 2012) (denying the defendant's motion for summary judgment because there was a dispute as to whether the medical staff failed to address the plaintiff's repeated request for medication and whether the plaintiff was provided the medication without excessive delays).

### B. *Monell* Claim against Wexford

Next, the Wexford Defendants argue that Plaintiff's *Monell* claim fails because there is no evidence that a Wexford policy "was the driving force behind any of the medical decisions made by the individual Wexford Defendants[.]" (R. 194, Mem. at 12.) More specifically, the Wexford Defendants contend that Wexford as a corporate entity does not dictate any specific medical treatment; instead, the physicians employed by Wexford dictate the treatment for their respective patients. (*Id.* at 12-13.)

"The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir.), *cert. denied sub nom. Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109 (2017). A plaintiff might prove this in one of several ways—first, "she might show that the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* (internal quotation omitted). "Second, she might prove that the constitutional deprivation was visited pursuant to governmental 'custom' even

16

though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* (internal quotation and alterations omitted). "Third, the plaintiff might be able to show that a government's policy or custom is made by those whose edicts or acts may fairly be said to represent official policy." *Id.* (internal quotation and alterations omitted). "Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Id.*

There is a genuine dispute of material fact about whether the alleged indifference to Plaintiff's serious medical needs was caused by a Wexford policy. Plaintiff presents evidence showing that he was denied treatment because of a Wexford policy that was instituted to cut Wexford's costs. (R. 217, Pl.'s Resp. to Wexford Facts ¶¶ 6-7, 9, 42, 46-47, 55.) Because this is evidence that a Wexford policy gave rise to a deprivation of Plaintiff's Eighth Amendment rights, Plaintiff's *Monell* claim survives summary judgment. *See Glisson*, 849 F.3d at 379; *King*, 680 F.3d at 1020-21 (reversing summary judgment on plaintiff's *Monell* claim because the plaintiff presented evidence to show that the state's contracted medical service provider instituted a policy restricting physician's treatment of the plaintiff, which led to a claimed deprivation of the plaintiff's Eighth Amendment rights); *Treadwell v. McHenry Cty.*, 193 F. Supp. 3d 900, 908-09 (N.D. Ill. 2016) (denying summary judgment on *Monell* claim where there was evidence that the state's contracted health care provider had a policy that resulted in the plaintiff not obtaining treatment).

## C.      IIED claim against Obaisi, Fuentes, Trost, Tilden and Ojelade

Finally, the Wexford Defendants argue that the Court should grant summary judgment on Plaintiff's IIED claims because he does not come forward with evidence of conduct that is sufficiently "extreme and outrageous." (R. 194, Mem. at 13-14.) According to the Wexford Defendants, because Plaintiff cannot survive summary judgment on his Section 1983 claims, "it

follows that he cannot meet the higher burden of showing that [the Wexford Defendants'] conduct was extreme and outrageous." (*Id.* at 14.) The Wexford Defendants also argue that there is no evidence Plaintiff suffered severe emotional distress. (*Id.* at 14-15.)

Under Illinois law, IIED requires proof of three elements: "First, the conduct involved must be truly extreme and outrageous." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (quotation omitted, applying Illinois law). "Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress." *Id.* (quotation omitted). "Third, the conduct must in fact cause severe emotional distress." *Id.* (quotation omitted); *see also Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016) (describing the same elements for an IIED claim under Illinois law).

The Wexford Defendants argue that even if Plaintiff's deliberate indifference claim survives summary judgment, his IIED claim cannot because IIED requires evidence of conduct that is more egregious as well as evidence of severe emotional distress. (R. 194, Mem. at 13-14.) The Court, however, finds that Plaintiff's evidence of deliberate indifference to Plaintiff's severe pain is also evidence that would allow a reasonable jury to conclude that the individual Wexford Defendants are liable for IIED. *See Cairel*, 821 F.3d at 835; *see also, e.g., Williams v. Mary Diane Schwarz, P.A.*, No. 15 C 1691, 2018 WL 1961143, at *9-11 (N.D. Ill. Apr. 26, 2018) (denying summary judgment on IIED claim where there was evidence showing that the defendant's treatment protocol was "blatantly" inappropriate); *Piercy v. Warkins*, No. 14 CV 7398, 2017 WL 1477959, at *21-22 (N.D. Ill. Apr. 25, 2017) (finding that evidence of deliberate indifference to the plaintiff vomiting blood was also enough evidence for the plaintiff's IIED claim to survive summary judgment.); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 942 (N.D. Ill.

2014) (evidence of deliberate indifference to the plaintiff's seizures was enough to create a triable issue as to the plaintiff's IIED claim). Accordingly, the Wexford Defendants' motion for summary judgment is denied in its entirety.

## II.     The State Defendants' Motion for Summary Judgment

First, the State Defendants argue that because Plaintiff is a class member in *Lippert*, his Section 1983 claims for injunctive relief against the individual State Defendants in their official capacity are barred. (R. 204, Mem. at 4-5.) Plaintiff argues that the claims in *Lippert* are not the same as the claims in this case, and that the State Defendants waived this argument by never raising it as an affirmative defense. (R. 237, Resp. at 3-5.)

*Lippert* is a class action lawsuit brought by Illinois inmates whose serious medical needs have allegedly been ignored due to "systemic deficiencies" in the health care provided at IDOC facilities. (10-cv-4603, R. 449, Fourth Am. Compl. ¶¶ 15-16.) The operative complaint in *Lippert* generally alleges, among other things, that IDOC facilities are: mismanaged, unsanitary, overcrowded, dangerous, not staffed with enough healthcare professionals, not properly supervised by healthcare professionals, lacking in a system that monitors health care professionals, lacking in adequate intake systems for patients, lacking in a reliable system for transferring medical accommodations between IDOC facilities, lacking in hospice facilities or services, reliant on a broken "sick call" program that does not address medical needs, and unable to provide timely treatment. (*Id.* ¶¶ 17-104.) The plaintiffs in *Lippert* request that the court enjoin IDOC and Wexford "from subjecting named Plaintiffs and the class to the illegal and unconstitutional conditions, acts, omissions, policies and practices set forth [in the complaint]." (*Id.* ¶ 164(d).) The class in *Lippert* consists "of all prisoners in the custody of [IDOC] with serious medical or dental needs." (*Id.* ¶ 152; 10-cv-4603, R. 534, Order at 20.)

The State Defendants observe that "[i]ndividual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action." *Reed v. Richards*, No. 93-1190, 1994 WL 259442, at \*4 (7th Cir. June 13, 1994) (quotation omitted).[6] The Court, however, declines to grant the State Defendants judgment as a matter of law because it is not clear that Plaintiff's requested relief aligns with the relief sought in *Lippert*. Specifically, Plaintiff asks the Court to enjoin the State and Wexford Defendants from "denying" or "delaying Plaintiff the necessary testing and medical treatment[.]" (R. 72, Second Am. Compl. ¶¶ 222(a), 228(a), 237(a), 251(a).) This relief goes more to certain Defendants' deliberate refusal to provide testing and medical treatment to Plaintiff instead of correcting systemic deficiencies with IDOC's health care system like *Lippert*. (*See* 10-cv-4603, R. 449, Fourth Am. Compl. ¶ 164(d).) *Reed* is simply not analogous because it involved a class action settlement that provided relief directly addressing the plaintiff's claims. *Reed*, 1994 WL 259442, at \*4. Here, it is not clear that the relief in *Lippert* addressing systemic issues at IDOC would provide Plaintiff the medical treatment he requests by rooting out the alleged intentionally bad actors in the prison health care system who Plaintiff claims deliberately denied him medical care. *See id.* In this case, there are factual disputes as to whether Plaintiff's alleged serious medical needs are not being attended to because of deliberate, wrongful actions by certain Defendants instead of a healthcare system that is pervasively inadequate. (*E.g.*, R. 72, Second Am. Compl. ¶¶ 113-14.)

Next, the State Defendants argue that the Court should grant summary judgment on the claims against Rauner, Godinez, Pierce, Butler, and Warden Williams because they had no

---

[6] The Court notes that *Reed* is an unpublished opinion issued before 2007, and therefore it is not binding precedent. *See* SEVENTH CIR. R. 32.1. Defendants cite to no other binding precedent to support their argument.

personal involvement in the events alleged in the second amended complaint. (R. 204, Resp. at 5-7.) "[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quotation omitted); *see also LaBoy v. Clements*, No. 15 CV 10771, 2017 WL 2936705, at *14 (N.D. Ill. July 10, 2017) (granting summary judgment because the plaintiff "provided no evidence establishing any Defendant's direct, personal involvement").

Plaintiff does not respond to Defendant's motion for summary judgment as to the claims against Rauner; thus, summary judgment is appropriate. (R. 237, Resp. at 1-2.) Instead, Plaintiff argues that there are factual disputes as to whether individual State Defendants "knew of or participated in systemic violations of the denial of medical care" at the IDOC facilities that housed Plaintiff, and points to an expert report from *Lippert* as evidence supporting this assertion. (R. 237, Resp. at 5-9.) Plaintiff claims that they were made aware of Plaintiff's injuries and medical needs through an expert report in *Lippert*. (*Id.*) Plaintiff, however, presents no evidence that Rauner was personally aware of the *Lippert* report and instead relies on a factual assertion that "IDOC," not Rauner, "was made aware of the *Lippert* report[.]" (R. 249, State Resp. to Pl.'s Facts ¶ 27.)

Even if there was evidence from which a jury could reasonably infer that Rauner were personally aware of the *Lippert* report, there is no evidence that the *Lippert* report made Rauner aware of Plaintiff's serious medical needs as opposed to general, systemic problems at IDOC facilities. (*Id.* ¶¶ 27-40.) Indeed, Plaintiff has never spoken with or personally seen Rauner. (R. 238, Pl.'s Resp. to State Facts ¶¶ 18-21.) The Court agrees that summary judgment is appropriate on the claims against Rauner because there is no evidence that he had any personal

involvement or knowledge of the misconduct alleged in the second amended complaint.[7] *See Minix*, 597 F.3d at 833; *LaBoy*, 2017 WL 2936705, at *14. The Court therefore, grants summary judgment as to the claims against Rauner in his personal and official capacity. *See Minix*, 597 F.3d at 833; *see also Zaya*, 836 F.3d at 804 (explaining that, for a deliberate indifference claim, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference").

As for Warden Williams, Butler, Pierce, and Godinez, Plaintiff argues that he personally spoke to them about his medical needs and that he wrote to Warden Williams about inadequate medical treatment. (R. 237, Resp. at 7.) He presents evidence supporting these assertions. (R. 238, Pl.'s Resp. to State Facts ¶¶ 23-24, 31, 39, 44-45; R. 239-5, Serio Suppl. Decl. at 2-3.) Accordingly, like with the individual Wexford Defendants, there is a factual dispute about whether Warden Williams, Butler, Pierce, and Godinez knew of Plaintiff's serious medical needs and were deliberately indifferent to them. *See, e.g., Flournoy*, 881 F. Supp. 2d at 989-90.

The State Defendants' next argument is that the claims for injunctive relief against Warden Williams, Barnett, Easton, and Griffin in their official capacities are now moot because Plaintiff does not reside at the correctional facilities where those Defendants are employed. (R. 204, Mem. at 9-10.) Plaintiff does not respond to this argument and therefore the Court grants summary judgment on these claims. *LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2009 WL 5579006, at *3 (N.D. Ill. Nov. 23, 2009) ("The law is clear in the Seventh Circuit that a party waives arguments not presented to the district court in response to summary judgment motions."). Likewise, Plaintiff presents no evidence that he is likely to return to the facilities

---

[7] Because summary judgment is granted as to the claims against Rauner, the Court does not reach the State Defendants' arguments that the claims against Rauner in his official capacity are barred by the Eleventh Amendment. (*See* R. 204, Mem. at 7-8.)

where these State Defendants work such that injunctive relief is needed to prevent imminent harm to Plaintiff. Accordingly, summary judgment is warranted on these claims for injunctive relief. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) ("If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred." (quotation omitted)).

Finally, the State Defendants argue that the Section 1983 deliberate indifference, IIED, ADA, and Rehabilitation Act claims fail because Plaintiff does not come forward with enough evidence to establish those claims. (R. 204, Mem. at 10-15.) The Court disagrees because there are factual disputes precluding summary judgment on each of these claims.

With respect to the Section 1983 claims against Barnett, Easton, and Griffin, there are too many disputed issues of fact to determine whether these Defendants were aware of and deliberately indifferent to Plaintiff's serious medical needs. Prison officials may be found to be deliberately indifferent to a prisoner's serious medical needs "if they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King*, 680 F.3d at 1018 (quotation omitted). "[W]hen a risk to the prisoner's health is so obvious that a jury may reasonably infer actual knowledge on the part of the defendants." *Estate of Gee ex rel. Beeman v. Johnson*, 365 F. App'x 679, 684 (7th Cir. 2010).

Disputes of material fact exist as to whether Defendant's condition was obvious and whether Barnett, Easton, and Griffin had a reason to believe or actual knowledge that prison medical professionals were mistreating or not treating Plaintiff. (R. 238, Pl.'s Resp. to State Facts ¶¶ 27-30, 46, 54-56; R. 249, State Resp. to Pl.'s Facts ¶¶ 2-3.) Accordingly, the Court denies the State Defendants' motion for summary judgment as to these claims. *See Flournoy*, 881 F. Supp. 2d at 991-92 (denying summary judgment where there was a factual dispute over

whether the warden of a correctional facility was alerted to a prisoner's grievances and therefore turned a "blind eye" to the plaintiff's medical needs). The Court also concludes that the IIED claims against Barnett, Easton, and Griffin are too factual to resolve on summary judgment for the same reasons. *See Piercy*, 2017 WL 1477959, at *21-22; *Awalt*, 74 F. Supp. 3d at 942.

Disputes of material fact related to whether Defendant is a "qualified individual" under the ADA and Rehabilitation Act are also readily apparent from the record; thus, summary judgment is denied as to Plaintiff's ADA and Rehabilitation Act claims. A "qualified individual" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131; *see also CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014) (noting that the ADA and Rehabilitation Act are coextensive on the issue of whether a person is a "qualified individual"). The State Defendants highlight these factual disputes, as they note in their motion that "the evidence clearly contradicts Plaintiff's assertion" that he is a qualified individual. (R. 204, Mem. at 14-15.) Defendants come forward with some evidence that Plaintiff suffered from "mild arthritis," (*id.*), but Plaintiff comes forward with his own evidence that he suffered from something more serious and from which a reasonable factfinder could find he is a qualified individual under the ADA and Rehabilitation Act, (R. 217, Pl.'s Resp. to Wexford Facts ¶ 32). The Court, therefore, denies summary judgment on the ADA and Rehabilitation Act claims. *See Feldman v. Olin Corp.*, 692 F.3d 748, 755-56 (7th Cir. 2012) (finding that summary judgment was not proper where there was a dispute of fact about whether

the plaintiff was disabled and whether a reasonable accommodation would have allowed the plaintiff to carry out his job duties).

## CONCLUSION

For the foregoing reasons, the Wexford Defendants' motion for summary judgment (R. 192) is DENIED. The State Defendants' motion for summary judgment (R. 202) is GRANTED in part and DENIED in part as set forth herein. The parties are directed to exhaust settlement possibilities in light of this decision. This delayed lawsuit will finally proceed to trial on April 1, 2019, unless the parties are able to settle this matter. A status hearing will be held on March 26, 2019, at 10:00 a.m.

ENTERED: 

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 12, 2019**